IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

AMY J. WALTERS,

                              Plaintiff,                              OPINION AND ORDER

    v.

                                                          12-cv-804-wmc

MAYO CLINIC HEALTH SYSTEM-
EAU CLAIRE HOSPITAL, INC.,

                              Defendant.

       In this employment discrimination action, plaintiff Amy J. Walters alleges that her former employer defendant Mayo Clinic Health System - Eau Claire Hospital, Inc. ("Mayo-Eau Claire"), discriminated against her because of her disability in violation of the Americans with Disability Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and retaliated against her for engaging in protected activity and interfered with her rights under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*[1]  Before the court is defendant's motion for summary judgment.  (Dkt. #36.)  Because the court finds that genuine issues of material fact exist with respect to both plaintiff's FMLA and ADA claims, the court will deny defendant's motion in its entirety.

---

[1] The parties have stipulated to the dismissal of Walters' hostile work environment claim under the ADA.  (Dkt. #103.)

UNDISPUTED FACTS[2]

**A. The Parties**

Plaintiff Amy J. Walters was employed at defendant Mayo-Eau Claire from 1998 until April 2011.  In 2008, Walters was promoted to an RN Lead Team position in the operating room.  Walters' 2007 through 2009 performance evaluations indicate her performance met or exceeded expectations.  Consistent with those evaluations, Walters was promoted again effective late August 2010 to a Perioperative Nurse Supervisor position, though she was not scheduled to begin the position until October 2010.

Walters has suffered from mental illness for many years, including chronic depression, anxiety and post-traumatic stress disorder ("PTSD").  She did not disclose her history of mental illness to her employer until 2010.  In December 2010, Walters was demoted to a staff nurse position and her employment was terminated in April 2011.

Part of the Mayo Health System, Mayo-Eau Claire is an acute hospital located in Eau Claire, Wisconsin.  For all times relevant to plaintiff's complaint, Lisa Heutmaker was Mayo-Eau Claire's Director of the Surgi-Center and Walter's supervisor for part of the relevant period.  Laurie Wensink, the Clinical Director of Perioperative Services, was Heutmaker's direct supervisor.  Julie Norgaard was the Senior Employee Relations Specialist.  Gary Welch supervised Walters in the operating room until her promotion to Supervisor in late August 2010; Welch resumed supervision when Walters was demoted to an operating nurse position in December 2010.

---

[2] The court finds the following facts taken from the parties proposed findings of fact to be material and undisputed when viewed in a light most favorable to plaintiff as the non-moving party.

2

**B. Mayo-Eau Claire's FMLA and Attendance Policies**

Mayo-Eau Claire's FMLA policy is administered by the Human Resources Department. (Declaration of Julie Norgaard ("Norgaard Decl."), Ex. 1 (dkt. #42-1).) If an employee has a medical condition which she believes entitles her to FMLA leave, the employee prepares a request for FMLA leave. Human Resources may also recommend that an employee seek such leave. A request for FMLA leave is preliminarily approved by the employee's supervisor and Human Resources, pending receipt of an FMLA certification from a health care provider. Once the FMLA certification is received, Human Resources evaluates whether to grant final approval and notifies the employee whether the request has been formally approved. If intermittent leave is granted, the employee need not submit a new request for FMLA leave during the approved intermittent leave period.

Mayo-Eau Claire has an attendance policy, providing for discipline if an employee accumulates a certain number of absences during a specified period of time. (Norgaard Decl., Ex. 2 (dkt. #42-2).) FMLA approved leaves do not count as absences under the policy. The attendance policy provides in pertinent part:

> E.    When absences can be predicted or foreseen, the employee is expected to notify and/or request approval from his/her supervisor or designee as far in advance as possible. Requesting approval from anyone other than the supervisor or designee is not acceptable.
>
> F.    When an absence is unexpected due to an emergency or sudden illness, the employee's supervisor or designee must be notified as soon as possible as defined by department standards.
>
> G.    Failure to notify the supervisor or designee of an absence may warrant corrective action not otherwise covered by this policy.

3

(*Id.* at p.2.)  Defendant represents that this policy also covers leaving work during a scheduled work day, but fails to cite to any particular provision of the policy stating that this is so.

The policy also describes "absence corrective steps" escalating from step 1 -- a verbal warning -- to step 4 -- termination for "unscheduled occurrences," although a separate portion of the policy governs corrective action for so-called "failure to report to work without notification" events.  (*Id.* at pp.2-3.)

**V.    FAILURE TO REPORT TO WORK WITHOUT NOTIFICATION.**

A.   It is imperative for the proper functioning of operations that employees give as much advance notice as possible when they will be unable to work for all or part of a scheduled shift.  Failure to report to work without notification or reasonable cause will result in a written warning for the first offense, and termination for the second offense occurring within twelve (12) months from the date of the first offense. Tardiness officially becomes an incident of "failure to report to work without notification" if an employee has not contacted the designated department contact by 30 minutes after the scheduled start of the shift without reasonable cause.

(*Id.* at p.3.)

The attendance policy also defines and sets forth corrective action for "tardiness":

**IV.    TARDINESS**

A.   The expectation is that all employees are to be in their designated area ready to work at the scheduled time.  Tardiness for work, especially when chronic, can create many problems for the work unit including difficulty accomplishing the normal work functions, as well as creating potential morale problems.

B.   Tardiness of one hour or greater will be considered an unscheduled absence. Therefore, any incidence of tardiness of one hour or greater will count toward the number of occurrences.

C.   The Director or designee has the responsibility to deal with tardiness of less than one hour separately.  The standard is three incidences of tardiness (of less than one hour) per quarter.  Formal corrective action will be followed for exceeding this standard.

(*Id.* at p.3.)[3]


### C. Events from October 5 to October 7, 2010

During the summer of 2010, in addition to transitioning to the newly-created position of Perioperative Nurse Supervisor for the new Surgi-Center and Recovery Room, Walters was going through a difficult divorce.  During that time and continuing into the fall of 2010, Walters began experiencing increased anxiety.  Walters saw her psychiatrist in August of 2010.  In addition to her then-existing prescribed medications, she began taking new medications.

Walters was scheduled to begin her orientation for her new position on October 5, 2010.  That morning, Walters arrived at work shortly before 8:00 a.m.  Feeling very anxious, Walters informed her trainer that she would be in her office catching up on some work before beginning orientation at 9:00 a.m.  Walters entered the office, which she shared with another nurse supervisor Denise Pendergast, closed the door, and attempted to control her anxiety.  At some point Pendergast entered the office, and Walters explained to her that she could not work and had attempted to call Heutmaker's office to inform her that she had to leave.  Walters also informed Pendergast that she was going to page Heutmaker.  Pendergast left the office, and Walters remained, trying to calm herself, but her anxiety continued to mount.

At some point, Walters decided to leave work in order to take anti-anxiety medication.[4]  At the time she made that decision, Walters reports that she was crying

---

[3] The underscoring is apparently part of the source document, though it is unclear when it was added.

5

uncontrollably, unable to speak, and believed that she had "text paged" Heutmaker to inform her of her need to leave. Walters then went home, took her medication, and went to sleep.

Around 10:30 a.m., Heutmaker began looking for Walters. Pendergast told Heutmaker that she had spoken to Walters earlier, Walters was having personal problems, that Walters was going to page Heutmaker and that she assumed Walters had gone home. Heutmaker then spoke with her supervisor Laurie Wensink, informing her that Walters could not be located. Wensink advised Heutmaker to speak with Legal and Human Resources.[5]

Around 3:00 p.m., Walters was awakened by a phone call from a co-worker, informing her that Heutmaker did not know where she was. Walters then called Heutmaker and explained what happened. Heutmaker advised her that leaving work without supervisory notice or consent was unacceptable. During the conversation, Walters informed Heutmaker that: she suffers from depression, anxiety and PTSD; she was experiencing so much anxiety that morning she could not talk to anyone; and she had to leave immediately to take medication and go to bed. Walters also told

---

[4] Walters testified at her deposition that she was at work for about two hours. In a letter to the Equal Rights Division, Walters stated that she was at work for "several hours." (Def.'s Reply to Def.'s PFOFs (dkt. #75) ¶ 81.) Regardless, of the exact timing, the record reflects that Walters had left by 10:30 a.m.

[5] This advice may have been prompted at least in part by the fact that Walters had recently gone through a difficult divorce, which defendant contends caused concern about Walters' safety in light of threats by her ex-husband.

Heutmaker that she tried to call her and page her before leaving work.[6]   Heutmaker
informed Walters that she had not received a call or text.

After the call with Walters, Heutmaker met with Norgaard in HR to discuss
whether Walters should receive a written warning for violating attendance and
timekeeping policies.[7]   While it appears Heutmaker and Norgaard reached no decision on
the appropriate discipline, if any, at that time, they did agree that Walters should be
required to submit a clearance from her physician prior to returning to work.   Norgaard
also advised Heutmaker to inform Walters that she could request FMLA leave for her
absence.   Heutmaker then called Walters back and told her that she needed to bring in a
form from her physician clearing her for work and also advised her that she could apply
for FMLA.

At some time later on October 5, 2010, Heutmaker, Wensink and Norgaard met
again to discuss the appropriate discipline for Walters due to her failing to notify and
obtain permission to leave work and for failing to clock in or out.   During that
conversation, Heutmaker informed both Wensink and Norgaard that Walters reported
suffering from "debilitating mental illness" and trying to contact Heutmaker prior to
leaving.   (Pl.'s PFOFs (dkt. #47) ¶ 39.)   These individuals decided to issue Walters a
written warning based on:   (1) their determination that Walters could have notified

---

[6] Defendant disputes that Walters told Heutmaker this.   (Def.'s Resp. to Pl.'s PFOFs
(dkt. #76) ¶ 34.)   For summary judgment, however, the court must assume Walters did
as she avers.

[7] Heutmaker also learned on October 5, 2010, that Walters had not clocked in or out
that day.   Walters contends that she did not clock in (and in turn, did not clock out)
because she did not believe she would be able to work that day.

Heutmaker before leaving work (in part because of her ability to speak with Pendergast); and (2) Walters' position as a supervisor, which required increased reliability. Plaintiff disputes that she could have notified Heutmaker, and in particular disputes -- in great detail -- which provisions of the attendance policy Heutmaker, Wensink and Norgaard relied on in making this decision. (Pl.'s PFOFs (dkt. #47) ¶¶ 44-54.) Defendant represents that the decision to discipline Walters was made prior to defendant's "receiving" Walters' request for FMLA leave. (Def.'s PFOFs (dkt. #38) ¶ 53.)

Heutmaker prepared the written warning on October 6, 2010. (Declaration of Michael Modl ("Modl Decl."), Ex. 5 (dkt. #45-5).) Walters returned to work on October 7, 2010. Heutmaker met with Walters that day and read the written warning to her. Walters was upset and objected, stating that (1) she could not help what happened; and (2) her absence was an FMLA-covered absence. Because Walters was so upset, Heutmaker called Wensink into the meeting.

Walters informed both Heutmaker and Wensink that she suffered from anxiety, depression and PTSD, was on medication and regularly seeking treatment with a psychiatrist. Walters also stated that her medications had been changed, which caused increased symptoms and difficulty. Walters further explained that she was experiencing a reoccurrence of a PTSD episode, and did not know how long the episode would last. She explained that "when this happens, I'm not able to talk to anybody." (Pl.'s PFOFs (dkt. #47) ¶ 65.) Heutmaker documented the conversation on October 11, 2010, noting that Walters reported her use of various prescription medications and Walters "was fearful

that this would damage our working relationship and was very embarrassed."  (*Id.* at ¶ 69.)[8]

### D. Walters' Use of FMLA

Over the course of her employment, Walters had used FMLA at Mayo-Eau Claire on a regular basis for her own serious health conditions and for her family members.  As recently as June and July 2010, Walters had taken FMLA leave, though that was for a physical rather than a mental health condition.  Walters testified at her deposition that she understood the process for requesting FMLA leave; when she needed leave, she applied for it and her requests were approved.

On or about October 27, 2010, Mayo-Eau Claire received Walters' FMLA certification from her physician for the October 5 and 6 absences, which were formally approved for FMLA leave.  The certification indicates that her condition is ongoing and chronic and will cause episodic flare ups, requiring Walters to be absent from work approximately one time per month.  (Affidavit of Carol N. Skinner ("Skinner Aff."), Ex.

---

[8] Plaintiff proposes a number of facts concerning Heutmaker's concerns about Walters' and Pendergast's maturity to take on the supervisor nurse roles; Walters' and Pendergast's concerns with Heutmaker's honesty and leadership abilities; other "facts" about the working dynamic of Heutmaker and Welch; and Heutmaker's alleged statements encouraging Walters to work off the clock.  (Pl.'s PFOFs (dkt. #47) ¶¶ 73-87.)  The relevance of these facts to Walters' claims is not entirely clear and therefore the court opts not to recount them in detail here.  Indeed, some proposed facts appear to cut against Walters' claims -- for example, a finding that Heutmaker was motivated to discipline Walters because of concerns about her maturity or judgment would seemingly undermine a finding that she acted because of a protected reason (*e.g.*, Walters' use of FMLA leave or her disability).

2 (dkt. #50-2).)  In response to the question of "is the employee unable to perform any of his/her job functions due to the condition?," Walters' physician checked "No."  (*Id.*)  Even so, the form indicates that:  (1) Walters will need to "attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition"; (2) "the condition [will] cause episodic flare-ups preventing the employee from performing his/her job functions"; and (3) it will be "medically necessary for the employee to be absent from work during the flare-ups."  (*Id.*)

Based on the certification, Walters was also approved for intermittent FMLA leave through December 31, 2010.  While Walters used eight hours of FMLA leave on November 8, 2010, she testified at deposition that despite having been approved for intermittent leave, she did not feel she could ask for it.  In an affidavit submitted in support of her summary judgment, Walters also avers that she was too nervous to take other FMLA leave, even though she needed to do so.  (Pl.'s PFOFs (dkt. #47) ¶ 100.)[9] Finally, Walters contends that she would have liked to have used FMLA leave again in February 2011, but her certification had expired, although she also admits that she did not submit a request form for FMLA leave in February 2011.  Walters explains that she was unable to see her psychologist during this time and therefore unable to secure the necessary medical certification for such leave.

---

[9] Defendant correctly points out in response to this proposed finding that Walters never testified to such nervousness during her deposition.  (Def.'s Resp. to Pl.'s PFOFs (dkt. #76) ¶ 100.))

**E.  Defendant's Knowledge of Walters' Mental Health State in Late 2010**

Heutmaker, Wensink and Norgaard were first informed of Walters' anxiety and depressive disorders and PTSD on October 5, 2010.  Before then, Walters had not informed a manager or supervisor of her mental health issues.

As indicated above, Walters' FMLA certification stated that she could perform all of her work duties.  Heutmaker contends that she was never advised to the contrary, though Walters periodically spoke with Heutmaker about difficulties she was having with sleep, medications, nausea and her ability to work.  (Def.'s Reply to Def.'s PFOFs (dkt. #38) ¶ 114; Pl.'s PFOFs (dkt. #47) ¶¶ 70, 95.)  Walters' supervisor after she was demoted in December 2010, Gary Welch, similarly avers that he was never informed that there were any work restrictions due to Walters' mental health condition, though Walters avers that she complained to Welch about increased anxiety and its impact on her ability to focus on patients.  Welch also commented that Walters had lost a lot of weight.  Welch sent Walters for a psychological exam on December 21, 2010, because Walters did not appear to have sufficient focus to be able to perform her work duties. When Walters asked why, she was told "someone said she needed one."  (Pl.'s PFOFs (dkt. #47) ¶ 153.)  Walters felt humiliated by this.[10]

Despite having received intermittent leave through the end of 2010, Walters did not take off work to attend counseling or manage medication, although defendant acknowledges that her November 8, 2010, FMLA absence could have been to manage a

---

[10] Walters met with the Employee Health nurse, who sent her back to work saying there was no apparent problem.

flare-up of her mental health condition.   Nonetheless, Heutmaker observed several instances when Walters appeared to be struggling and recorded these instances in contemporaneous notes.   On November 22, 2010, Heutmaker noticed that Walters was having trouble staying awake in a perioperative leadership meeting.   That same day, Walters had arrived late to work and informed Heutmaker that she had taken Xanax and sleeping pills the night before.   On November 24, 2010, Heutmaker documented a meeting with Walters in her office where Walters was "looking away as if she could cry, fidgeting, and seeming very agitated."   (Pl.'s PFOFs (dkt. #47) ¶ 97.)   During that meeting, Walters told Heutmaker that she needed to go home and take medication.

While Walters submitted no formal requests for accommodations, Walters asked Heutmaker on December 3, 2010, to "understand how difficult her personal life is and give her some room for that."   (Pl.'s Resp. to Def.'s PFOFs (dkt. #56) ¶ 130.) According to Heutmaker's contemporaneous notes, she "expressed [her] understanding of this, but that it cannot come in the way of [Walters] position."   (Pl.'s PFOFs (dkt. #47) ¶ 109.)   On December 15, 2010, Walters also wrote an e-mail to Director Ken Lee, explaining her situation and asking for his help.   (Skinner Aff., Ex. 16 (dkt. #50-16).)   In particular, Walters explained that she was "going through some very hard emotional and personal issues" and that she has "some mental illness issues from some traumatic experiences in my past that were resurfacing during this time."   (*Id.*)   During the relevant time period, no one at Mayo-Eau Claire asked Walters about accommodating her mental health needs.

Walters also contends that the stress she was experiencing in the fall of 2010 was affecting her ability to sleep and eat, resulting in significant weight loss, which was readily apparent.  By December, Walters weighed less than 100 pounds.  Pendergast observed that Walters (1) seemed to be getting more agitated and stressed as the weeks went on in the fall of 2010, (2) seemed to be struggling to hold it together, and (3) seemed preoccupied, distracted and lost.

Between October 28, 2010, and April 14, 2011, Walters did not see a health care professional for any mental health condition, other than one phone call on December 29, 2010, for a medication refill.

### F.  December 8, 2010, Disciplinary Action

On November 22, 2010, Walters was scheduled to be at work at 5:15 a.m. as the "charge nurse."  Walters arrived approximately 45 minutes late, after she had been called at home.  While Walters admits she may have told others that she was late because her alarm did not go off, Walters informed Heutmaker that she had overslept because she had taken Xanax and a sleeping pill the night before.  Still, defendant contends that "Walker never advised that she was late for work due to a flare up of any mental health condition."  (Def.'s PFOFs (dkt. #38) ¶ 150.)  Walters also did not request FMLA leave to cover her 45-minute absence.

On November 30, 2010, Walters sent Heutmaker a text message stating that she would be late for work because she was taking her daughter to the doctor.  Walters

13

nevertheless clocked in at 7:55 a.m. and did not clock out when she left work to pick up her daughter.  Walters returned to work at 10:00 a.m.

On December 3, 2010, Walters was scheduled to report to the PACU[11] at 8:00 a.m.  Defendant claims that Walters did not show up until 8:13 a.m.  Although Walters disputes this, stating that she arrived at work at 7:57 a.m. as reflected in the contemporaneous time records, defendant maintains that she was not at her unit ready to work until 8:13 a.m.  (Def.'s Reply to Def.'s PFOFs (dkt. #75) ¶ 156.)

On December 8, 2010, defendant maintains that Walters was again scheduled to work at 8:00 a.m., while Walters contends that her start time was changed to 9:00 a.m. in the scheduling book "pursuant to an instruction from Heutmaker" not to work my regular office hours "as scheduled if I was going to be acquiring overtime" and to "adjust my hours as necessary to make that happen."  (Pl.'s Resp. to Def.'s PFOFs (dkt. #56) ¶ 157; Deposition of Amy Walters ("Walters Depo.") (dkt. #44) 145-147.)  Walters called Pendergast to make sure she knew that Walters would not be in until 9:00 a.m., but did not call Heutmaker.  Walters arrived at work at 9:00 a.m.  In a later conversation that day with Heutmaker, Walters acknowledged that she should have called her as well to notify her of the change in start time.

That same day, Heutmaker spoke with Norgaard and Wensink about Walters' continued attendance problems.  Based on her performance, including attendance violations, these individuals concluded that Walters could be terminated.  Instead,

---

[11] The parties do not appear to define this term, but the court assumes it stands for Post-Anesthesia Care Unit.

Heutmaker decided, in consultation with Wensink and Norgaard, to give Walters an opportunity to resign or to suspend her by placing her on probation and removing her from the supervisor position, rather than terminating Walters.  The December 8, 2010, "Notice of Corrective Action" lists the sole reason for the action as "Tardy x 4" and identifies 11/22/2010, 11/30/2010, 12/03/2010 and 12/08/2010 incidents.[12]   (Modl Decl., Ex. 9 (dkt. #43-9).)    The form also notes her "Previous Written Warning 10/06/10."   (*Id.*)   Walters appealed her suspension and demotion under the "fair treatment program," but it was upheld.

Gary Welch was advised that Walters was not succeeding in her supervisor position, including a variety of attendance and clocking problems.  Welch agreed to have Walters return to the operating room as a staff nurse, but not in the lead role she had previously occupied prior to her promotion to supervisor nurse.  Welch explained this decision based on Walters' "issues with attendance, punctuality, ability to stay on the job."  (Pl.'s PFOFs (dkt. #47) ¶ 146.)  As part of her transition, Welch prepared "return to work guidelines" for Walters.

### G. Subsequent Suspension and Termination

On March 18, 2011, Gary Welch suspended Walters for three days without pay for four episodes of tardiness, one of which -- March 9, 2011 --, defendant contends constituted a "no call/no show" or "failure to report to work without notification" under the attendance policy.   (Modl Decl., Ex. 12 (dkt. #43-12).)  Walters denies that she was

---

[12] Walters contends that the actual decision to demote her was made -- or at least initially considered -- weeks before December 8, 2010. (Pl.'s PFOFs (dkt. #47) ¶ 115.))

a no call/no show on March 9, 2011, claiming that the night before she had worked late until 11:39 p.m., and understood that the charge nurse, Paula Kroll, approved her to start one hour late the next morning and that Kroll also told Walters that she would make sure the appropriate person knew of this change.[13]   The other tardies consisted of: (1) three minutes late on February 12, 2011; (2) one minute late on March 14, 2011; (3) punched in at 6:59 on March 15, 2011, but did not report to the department until 7:05 a.m. (Walters had called to report she would be late); and (4) on March 20, 2011, Walters did not attend a staff meeting and clocked in using her phone at 6:55 a.m., but was still seen in the hall still wearing street clothes at 6:58 a.m..  (Pl.'s PFOFs (dkt. #47) ¶ 176).)

Mayo-Eau Claire has not suspended or demoted a single employee in the last five years for having four tardies.  Plaintiff also proposes facts based on testimony from other Mayo-Eau Claire supervisors stating that they would not issue a corrective action, other than a verbal warning perhaps, if a person were tardy only four times.  (Pl.'s PFOFs (dkt. #47) ¶¶ 139-141.)  Defendant points out, however, that two of the four tardies listed on the March 18, 2011, corrective action constitute "no calls/ no shows."  (Def.'s Resp. to Pl.'s PFOFs (dkt. #76) ¶ 132.)

On April 12, 2011, Walters was scheduled to work at 7:00 a.m.  Walters claims that she looked at the wrong week on the schedule, and thought she was scheduled to work at 10:00 a.m.  Walters did not show up for work as scheduled and did not contact the unit.   After receiving a message from work, Walters called the department at

---

[13] Defendant responds that Kroll was not Walters' supervisor, and that only a supervisor could have authorized Walters to begin work an hour late.

approximately 9:40 a.m., more than two and a half hours after the start of her shift.  She apologized and said that she would be right in, but was told "don't bother."  (Pl.'s PFOFs (dkt. #47) ¶ 189.)  On April 15, 2011, Walters was terminated for "multiple events of tardiness and a prior no call no show."  (Modl Decl., Ex. 13 (dkt. #43-13).)  At her termination meeting, Wensink told Walters, "we just want you to get better."  (Pl.'s PFOFs (dkt. #47) ¶ 192.)

### H. Treatment of Other Employees with Unscheduled Absences and Tardies

Pendergast was tardy enough times in the fall of 2010 that Heutmaker verbally warned Pendergast about it more than once.  Heutmaker issued no corrective action against Pendergast for her tardies.  Jerry Skoug, an RN in the PACU in 2010 and 2011 and also under the supervision of Heutmaker, had 25 tardies and 11 days of unscheduled absences during the period from January 2010 to April 2011.  No corrective actions were issued until a verbal warning was issued in October 2011, citing six unscheduled absences between October 2010 and July 2011.  Andrea Eastwold was an RN in the PACU in 2010-2011, also under the supervision of Heutmaker.  Eastwold had 13 tardies and 9 days of unscheduled absences during the period January 2010 to April 2011.  No corrective action was initiated against Eastwold, until she received a verbal warning in August 2011, citing five unscheduled absences between July 2010 and July 2011.[14]

---

[14] Plaintiff describes other employees' absences and progressive corrective action, presumably in an attempt to demonstrate that similarly situated individuals without a disability were treated more favorably than she was.  (Pl.'s PFOFs (dkt. #47) ¶¶ 193-214.)  The court will not recount all of these proposed facts here, other than to note that

Plaintiff contends that none of these individuals have mental health issues or are otherwise disabled.

OPINION

## I.  FMLA Claim

In issuing the October 6th written warning, plaintiff claims that Mayo-Eau Claire either interfered with her rights under the FMLA (29 U.S.C. § 2615(a)(1)) or retaliated against her because of her use of FMLA leave (29 U.S.C. § 2615(a)(2)).  (Pl.'s Opp'n (dkt. #46) 6 ("The lines between an interference and retaliation claims are somewhat blurred.").)  Given the record, plaintiff's claim fits better as an interference claim.

To prove retaliation, plaintiff would have to show discriminatory intent on the part of defendant.  *See Pagel v. Tin, Inc.*, 695 F.3d 622, 626 (7th Cir. 2012) ("The difference between the two theories is that a retaliation claim requires the employee to prove discriminatory or retaliatory intent while an interference claim only requires the employee to prove that the employer denied him entitlements provided by the Act.").  Under either the direct or indirect method, plaintiff offers insufficient evidence that the defendant issued its October 6th written warning in retaliation for her use of FMLA leave.[15]  On the contrary, the *only* evidence plaintiff advances for retaliation is suspicious

_____

other nurses with unscheduled absences and / or tardies were not terminated because of these occurrences.

[15] In rebutting an FMLA retaliation claim, defendant primarily focuses on the timing, attacking proof of Walters' decision to take FMLA leave and defendant's issuance of a written warning, contending that "[t]he decision to give Walters a written warning was made prior to *receiving* her request for FMLA leave."  (Def.'s PFOFs (dkt. #38) ¶ 53.) While one might debate what defendant means by "receiving," the court presumes -- and

timing, but that alone is not enough here.  *See Morgan v. SVT, LLC*, 724 F.3d 990, 998 (7th Cir. 2013) ("[S]uspicious timing alone is rarely enough to survive summary judgment.").

Even if plaintiff had come forward with sufficient proof to permit a finding of retaliation, her claim for retaliation under the FMLA would still be fatally flawed, since she would also have to demonstrate that the October 6th written warning constituted a materially adverse action.   Here, such a finding appears unlikely, if not entirely foreclosed.  *See, e.g.*, *Benuzzi v. Bd. of Educ. of City of Chi.*, 647 F.3d 652, 665 (7th Cir. 2011) ("Generally, written warnings, standing alone, do not constitute materially adverse actions.").

In contrast, to prove interference, Walters must demonstrate that:

> (1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled.

---

the record would allow a finding -- that the *decision* to discipline her happened before Walters' submitted a formal request for FMLA leave, although not before the defendant was aware of this possibility.  To the contrary, only *after* Heutmaker spoke with Walters and learned of her mental health issues -- and therefore was put on notice that Walker likely had an FMLA-eligible condition -- did Heutmaker, Wensink and HR decide to issue her a written warning.  *See Burnett v. LFW Inc.,* 472 F.3d 471, 479 (7th Cir. 2006) (explaining that an employee provides notice to an employer when he provides enough information "to show that he likely has an FMLA-qualifying condition").   Even if defendant had been placed on notice of an FMLA-qualifying condition after making the decision to issue a written warning (or even after actually issuing the written warning), defendant could have changed its decision or even removed the written warning from her file.  *E.g., Breneisen v. Motorola, Inc.*, 512 F.3d 972, 981 (7th Cir. 2008) (affirming dismissal of FMLA claims, in part, because plaintiff admitted that the absences were eventually marked excused).

*Pagel*, 695 F.3d at 627 (internal citation and quotation marks omitted).  The parties' factual dispute rests solely on the fifth element -- whether she was denied her FMLA benefits.

While there is no dispute that plaintiff was granted FMLA leave for October 5th and October 6th, plaintiff argues that she was denied benefits because, while labeled "FMLA" leave, plaintiff was disciplined for taking such leave and, therefore, the leave was not "job-protected."  (Pl.'s Opp'n (dkt. #46) 6.)  *See also Lewis v. Sch. Dist. #70*, 523 F.3d 730, 743 (7th Cir. 2008) (describing FMLA leave as "illusory" where defendant failed to account for that leave in terminated her employment for performance reasons).   In support, plaintiff cites to 29 C.F.R. § 825.220(c), which provides in pertinent part: "Employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under 'no fault' attendance policies."

In response, defendant argues that plaintiff was not disciplined for an FMLA-approved leave, but rather was disciplined because of her failure to notify her supervisor before leaving work and to clock in and out on October 5, 2010.  Defendant's position turns on the reasonableness of its position that Walters could have notified her supervisor prior to leaving work on October 5, 2010.   In other words, in disciplining Walters, defendant concluded that her absence was not "unexpected due to an emergency or sudden illness" or that she had a "reasonable cause" for failing to report to work.  (Norgaard Decl., Ex. 2 (dkt. #42-2).)  Given the undisputed record that Walters informed Heutmaker before the decision to issue her a written warning (and certainly

20

before the warning was actually issued) that she had to leave work because she was having an anxiety attack, Walters has raised a genuine issue of material fact as to: (1) whether she needed to or could have provided further notice to her supervisor before leaving work; and in turn, (2) whether the written warning interfered with her rights under the FMLA. Accordingly, the court will allow plaintiff to proceed on her claim that the October 6th written warning interfered with her rights under the FMLA.

## II. ADA Claims

Walters also brings two claims under the ADA: (1) a failure to accommodate claim pursuant to 42 U.S.C. §12112(b)(5)(A); and (2) a discrimination claim pursuant to 42 U.S.C. § 12112(a). As a threshold matter, defendant *appears* to challenge -- it is not entirely clear -- whether Walters is able to meet the "disabled" element of either claim. (Def.'s Br. (dkt. #37) 17-18, 33.) The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities . . . ; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

As plaintiff points out, the 2008 amendments to the ADA changed the definition of "substantially limits" in at least two key respects: (1) a person with an impairment that substantially limits a major life activity, or a record of one, is disabled, even if the

21

impairment is "transitory and minor" (defined as lasting six months or less); and (2) "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." *Gogos v. AMS Mech. Sys., Inc.*, 737 F.3d 1170, 1172-73 (7th Cir. 2013) (quoting 42 U.S.C. § 12102(4)(D); citing 42 U.S.C. § 12102(3)(B); 29 C.F.R. § 1630.2(j)(1)(ix)).  Moreover, the ADA expressly provides that "the definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12101(4)(A).  In light of this broad definition, the court has little trouble finding that plaintiff has put forth more than sufficient evidence to demonstrate that her mental health issues substantially limits one or more major life activities, at least during the period of time or times she experienced heightened anxiety or increased depression due to a reoccurrence of PTSD.  Accordingly, the court turns to the defendant's specific challenges to each of plaintiff's two ADA claims.

### A.  Failure to Accommodate Claim

The ADA requires employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A).  "In order to establish a prima facie case of failure to accommodate under the ADA, 'a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and

(3) the employer failed to reasonably accommodate the disability.'" *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1176 (7th Cir. 2013) (quoting *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747-48 (7th Cir. 2011)).  Defendant raises challenges as to all three elements, but focuses on the third element.

### i.   Employer's Failure to Reasonably Accommodate Disability

Defendant contends that it discharged any duty to provide a reasonable accommodation by granting Walters' request for intermittent FMLA leave, the only accommodation Walters sought.  (Def.'s Opening Br. (dkt. #37) 30-32.)  This argument is based on two faulty premises.  *First*, defendant appears to assume that FMLA leave is the *only* accommodation which might have allowed Walters to perform the essential functions of her job.  Job restructuring or a part-time / modified work schedule -- both of which are included on the list of "reasonable accommodations" under the ADA, 42 U.S.C. § 12111(9) -- may also have been appropriate.  We do not know, however, whether these accommodations would have been possible or successful, because there was no interactive process to determine which, if any, accommodations could assist Walters in her job.

*Second*, defendant also assumes that it had no duty to engage in an interactive process because "Walters made no requests for any specific accommodation."  (Def.'s Opening Br. 9dkt. #37) 31.)  While "the standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches," *James v. Hyatt Regency Chi.*, 707 F.3d 775, 782 (7th Cir. 2013), the Seventh Circuit has stressed that

"[n]o hard and fast rule will suffice"; instead, "courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). The regulations also contemplate an interactive process initiated by the employer. 29 CFR § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation, it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation.").

The duty of an employer to initiate or react to an employee's more general requests for assistance is heightened when the employee's disability is related to her mental, rather than physical, health. "In a case involving an employee with mental illness, the communication process becomes more difficult." *Bultemeyer v. Fort Wayne Cmty. Schools*, 100 F.3d 1281, 1285, 1286 (7th Cir. 1996). As a result, where an employee suffers from mental health problems, the employer has "some responsibility" to take the small step of inquiring about possible accommodations. *Id.*; *see also Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 315 (3d Cir. 1999) (explaining that an employer should bear some of the burden of triggering an interactive process for an employee with a mental health problem because "an employee with a mental illness may have difficulty effectively relaying medical information about his or her condition, particularly when the symptoms are flaring and reasonable accommodations are needed") (citing *Bultemeyer*).

The defendant attempts to distinguish cases recognizing this duty largely on the basis that the mental health issues in those cases were much more extreme than those

presented by Walters here and that the defendants in those cases were more aware of the employee's disabilities.   (Def.'s Reply (dkt. #73) 21-23.)   While certainly arguable, plaintiff has still put forth sufficient evidence from which a reasonable jury could find that Walters sufficiently informed her supervisors of her mental health issues, as well as specifically advised them that she was struggling and asking for help.   Unlike the defendants in *Bultemeyer* and *Taylor*, the defendant here is a *health care provider* and arguably should have been *more* attuned to plaintiff's need for accommodation -- whether in response to physical or mental health challenges -- than employers outside the health care field.

Nor can Walters be faulted because she asked for "help," rather than using the word "accommodation."   The ADA does not require such an explicit request of the plaintiff, and certainly not where the plaintiff suffers from mental illness.  *Bultemeyer*, 100 F.3d at 1285 ("[P]roperly participating in the interactive process means that an employer cannot expect an employee to read its mind and know that he or she much specifically say, 'I want a reasonable accommodation,' particularly when the employee has a mental illness.").

Defendant also argues that it had no duty to accommodate Walters' "erratic or unreliable attendance" because "[a]n employer is generally permitted to treat regular attendance as an essential job requirement."   (Def.'s Opening Br. (dkt. #37) 29 (citing *EEOC v. Yellow Freight Sys. Inc.*, 253 F.3d 943, 948-49 (7th Cir. 2001); *Waggoner v. Olin Corp.*, 169 F.3d 481, 484 (7th Cir. 1999)).)   The cases cited by defendant, however, involve requests for "unlimited sick days" or an "open-ended schedule that would allow

25

[the employee] to come and go as he pleased." *Yellow Freight*, 253 F.3d at 950-51.  There is nothing in the record to indicate that Walters sought such a sweeping accommodation, or that such an extreme request would have been necessary to assist Walters in meeting the essential functions of her employment.  On the contrary, Walters' physician advised that her condition while chronic was triggered by episodic flare-ups and could be accommodated by as little as a monthly absence, follow-up treatment or a part-time or reduced work schedule.  In any event, by failing to engage in any dialogue as to reasonable accommodations, defendant forecloses the opportunity to assess the reasonableness of plaintiff's accommodation needs.

Finally, defendant raises two additional arguments for the first time in its reply brief, both of which this court is free to disregard.  *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited.").  Nonetheless, the court will address each briefly.  First, defendant cites to case law that "a failure [to accommodate claim] is only actionable if it prevents identification of an appropriate accommodation for a qualified individual."  (Def.'s Reply Br. (dkt. #73) 18 (quoting *Basden v. Prof. Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013)).)  In addition to waiting to its reply to raise this issue, defendant fails to develop this argument.  Even if the court were to consider it, certain reasonable accommodations -- as discussed above -- may have addressed Walters' limitations or at least a genuine issue of material fact exists as to whether any of these would have been appropriate.

*Second*, defendant argues for the first time in its reply brief that an employer need not "accommodate disabilities that have no bearing on an employee's ability to perform the essential functions of her job." (Def.'s Reply (dkt. #73) 26 (citing *Brumfield v. City of Chi.*, 735 F.3d 619 (7th Cir. 2013)).) Defendant then contends that "nearly all of Walters' attendance problems . . . had absolutely nothing to do with any mental health issues and therefore required no accommodation." (*Id.* at 29.) But this statement rests on a factual determination: while a reasonable jury *could* find that Walters' absences were unrelated to her disability and therefore defendant need not have offered an accommodation, a reasonable jury could also find -- and the record certainly supports a finding -- that Walters' attendance slip-ups during the relevant period of time were due to a sharp decline in her mental health during that same period.

### ii.    Qualified Individual with a Disability

Relatedly, defendant argues that Walters is not a "qualified individual" because she could not perform the essential functions of her job, namely, by consistently reporting for work as required. (Def.'s Reply (dkt. #73) 29.) This very argument, however, was rejected by the Seventh Circuit in *Bultemeyer*:

> under the ADA, a "qualified individual with a disability" is one who, "*with or without* reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis added). Bultemeyer may have been qualified, because he may have been able to perform the essential functions of the job *with reasonable accommodation*. FWCS simply did not give him a chance to demonstrate this. In other words, had FWCS accommodated Bultemeyer by finding him another position or by simply sitting down with

27

> him and talking about the situation, he may have been willing
> and able to take the physical and report for work.

100 F.3d at 1284-85.  This holding would seem particularly apt where the plaintiff's tardiness were apparently (or at least arguably) a relatively recent phenomenon, explainable as part of an onset of mental health issues, and otherwise out of character.

### iii.    Employer's Knowledge of Disability

Finally, defendant contends that it lacked knowledge of Walters' disability -- or the specific limitations associated with her disability -- largely relying on the FMLA certification's notation that Walters was able to perform all of the duties of her job with these conditions.  (Def.'s Opening Br. (dkt. #37) 26.)   Here, too, however, there is ample, contrary evidence in the record to permit a reasonable jury to find that:  (1) Walters alerted her supervisors of her ongoing mental health issues; (2) her supervisors were aware that Walters' mental state had abruptly changed during the relevant period of time; and (3) Walters' recent failings on the job would seem at least partially explainable by these mental health issues, even to a lay person much less a health care worker.

As detailed in the undisputed findings of fact above, the record demonstrates that Walters told Heutmaker and Wensink in early October 2010 that she was suffering from a reoccurrence of PTSD, which caused anxiety to such a degree that she could not talk to people.  Walters also told Heutmaker around that same time that she needed to take medications for her illness, including sleeping, anti-anxiety and anti-depression medications, and that these medications cause nausea and made it difficult for her to both sleep and awaken.  Heutmaker also formally documented that on November 22,

28

2010, Walters advised that she was unable to wake up because she had taken Xanax and sleeping pills the night before.  Heutmaker also noted in writing on November 24, 2010, that Walters was "looking away as if she could cry, fidgeting, and seeming very agitated." (Pl.'s PFOFs (dkt. #47) ¶ 97.)  Other employees and supervisors similarly noted that she seemed distracted and not fully engaged.

On December 3, 2010, as also reflected in Heutmaker's contemporaneous notes, Walters expressed frustration that "we don't all understand how difficult her personal life is and give her some room for that."  (*Id.* at ¶ 130.)  Instead, of initiating a discussion about what accommodations might give Walters the room she needed to address the challenges in her life, Heutmaker told Walters that these challenges "cannot come in the way of her position."  (*Id.*)  Moreover, in mid-December, Walters went above Heutmaker and Wensink to Director Ken Lee, asking *him* for assistance and specifically mentioning "mental illness."  (Skinner Aff., Ex. 16 (dkt. #50-16).)

Coupled with defendant's knowledge of Walters' diagnosed mental health issues, the evidence above is sufficient, interpreting all disputed facts in Walters' favor, for a reasonable jury to find that defendant was aware of Walters' disability and of the limitations associated with that disability, as well as that this awareness gave rise to defendant's duty to engage in an interactive process with plaintiff on how to reasonably accommodate her limitations.

**B. Discrimination Claim**

To demonstrate discrimination under the ADA, plaintiff must not only prove that she is disabled within the meaning of the ADA and qualified to perform the essential functions of the job, either with or without a reasonable accommodation, but also that she suffered an adverse employment action because of her disability. *Gogos,* 737 F.3d at 1172. If the employer would have undertaken the same action in the absence of a disability, there is no ADA claim. *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010) ("[T]he statute's 'because of' language demands proof that a forbidden consideration . . . was a 'but for' cause of the adverse action complained of.").[16] Since the court has already addressed the first two elements as part of its discussion of plaintiff's accommodation claim, the court will focus on plaintiff's proof of an adverse employment action because of her disability.

Discriminatory motive can be shown in one of two ways under the ADA. *Cloe,* 712 F.3d at 1182. "Under the direct method, a plaintiff can present either direct or circumstantial evidence to meet its burden." *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522,* 657 F.3d 595, 601 (7th Cir. 2011). "The type of circumstantial evidence that a

---

[16] Plaintiff questions whether the test should be that plaintiff suffered an adverse employment action "on the basis of" her disability rather than "because of" her disability. (Pl.'s Opp'n (dkt. #46) 33.) The court will take up this issue again in crafting jury instructions and the special verdict form, although the difference between the two escapes the court. Regardless of which term is used, the jury will be instructed that Walters' disability is a "necessary condition" of an event. *See Hudson v. Lands' End Inc.*, 928 F. Supp. 2d 1045, 1055 (W.D. Wis. 2013). In other words, plaintiff will have to demonstrate that the employer would not have undertaken the same action if Walters had not been disabled. *See* 7th Cir. Pattern Civ. Jury Instr. 3.01 (double negative in pattern instruction).

plaintiff may produce to survive summary judgment includes: (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Id.*

Alternatively, a plaintiff may "indirectly" prove discrimination under a burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* Under this method, "a plaintiff must first establish a prima facie case of discrimination by showing that (1) he is disabled under the ADA; (2) he was meeting his employer's legitimate employment expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably." *Id.* Once the plaintiff has established this case, the defendant must identify a legitimate, nondiscriminatory reason for its employment decision. *Id.* If the defendant does so, the burden shifts back to the plaintiff to prove that defendant's reason is pretextual. *Id.* At summary judgment, plaintiff offers proof under the indirect method. (Pl.'s Opp'n (dkt. #46) 34.)

Defendant contends that summary judgment is proper because Walters was not demoted, suspended, and terminated because of her disability, but rather because of her attendance problems. (Def.'s Opening Br. (dkt. #37) 37-40.) Whether defendant proffers this argument as a legitimate, nondiscriminatory reason for its adverse actions against plaintiff or whether defendant is challenging plaintiff's proof of the second element of her prima facie case under the indirect method -- that Walters was meeting

31

her employer's legitimate employment expectations -- is immaterial at this point since the following factual issues preclude summary judgment either way.

First, plaintiff disputes defendant's characterization of Walters' attendance record, as well as defendant's assertion that termination was appropriate under its attendance policy.  As detailed above, plaintiff disputes defendant's characterization of certain events as "occurrences" under the policy.  Specifically, plaintiff disputes defendant's counting as "true tardies" those instances where Walters had clocked in before her work start time.  Plaintiff also disputes defendant's characterization of her March 9, 2011, absence as a "no call / no show" on the grounds that the charge nurse the night before had approved her late start.  Finally, plaintiff maintains that her arrival at 9:00 a.m. on December 8, 2010, instead of 8:00 a.m., was consistent with Heutmaker's instruction to avoid overtime.

Second, and relatedly, plaintiff contends that defendant tolerated some degree of tardiness and unscheduled absences from other employees.  (Pl.'s Opp'n (dkt. #46) 34-40.)  Defendant responds that these individuals did not have a record of "no call/no show" occurrences, but in light of plaintiff's challenge to the two "no call / no show" events described above, there is a factual dispute as to whether Walters' attendance issues were somehow more significant.  As such, a fact issue exists as to whether plaintiff's attendance record justified defendant's adverse actions in light of defendant's practice (if not their express policy) of dealing with attendance issues.

Finally, a reasonable jury could find that plaintiff's mental health issues contributed to her attendance problems.  Based on this finding, the jury could in turn

conclude that disciplining Walters and terminating her employment was indeed discriminatory.  All of this is to say that plaintiff has put forth sufficient evidence from which a reasonable jury could find that she was disciplined and terminated because of her disability.

## ORDER

IT IS ORDERED that:

1. defendant Mayo-Eau Claire's motion for summary judgment (dkt. #36) is DENIED; and

2. to accommodate the court's schedule, the final pretrial conference will take place on March 13, 2014, at 3:00 p.m.  Contested exhibits are due March 12, 2014, by noon.  All other pretrial deadlines remain in place.

Entered this 10th day of February, 2014.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge